UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

FREDERICK SMITH,

                                  Plaintiff,

                                                                    9:18-cv-01066
v.                                                                 (MAD/TWD)


C.O. STEVEN DODGE, et al.,

                                  Defendants.

_____

APPEARANCES:                                  OF COUNSEL:

ASHER & ASSOCIATES, PC                        RYAN ASHER, ESQ.
Counsel for Plaintiff                         ROBERTA D. ASHER, ESQ.
111 John Street, 14th Floor
New York, New York 10038

HON. LETITIA JAMES                            KONSTANDINOS D. LERIS, ESQ.
New York State Attorney General               BRENDA BADAM, ESQ.
Attorney for Defendants
The Capitol
Albany, New York 12224


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.    BACKGROUND AND PROCEDURAL HISTORY

        Plaintiff Frederick Smith ("Plaintiff" or "Smith"), an inmate in the custody of the New

York State Department of Corrections and Community Supervision ("DOCCS"), commenced

this civil rights action under 42 U.S.C. § 1983 asserting claims arising out of his confinement at

Great Meadow Correctional Facility ("Great Meadow").  (Dkt. No. 13.)  Plaintiff alleges that on

September 9, 2015, Corrections Officers ("C.O.") Steven Dodge ("Dodge"), Jason Ashline

("Ashline"), and Peter McNally ("McNally"), and Sergeant William Murray ("Murray") (collectively "Defendants") assaulted him in violation of his Eighth Amendment constitutional rights. *Id.* In lieu of serving an answer, Defendants moved for summary judgment asserting that Smith's failure to timely comply with the requirements of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), bars him from pursuing this lawsuit. (Dkt. No. 16.) Smith alleges he attempted to properly grieve the assault, but that he could not do so because of the Great Meadow prison staff's misconduct. (*See generally* Dkt. Nos. 21, 23.)

On May 24, 2019, this action was dismissed in its entirety and judgment was entered in favor of Defendants due to Smith's failure to exhaust administrative remedies as required by the PLRA. (Dkt. No. 35.) Plaintiff appealed to the United States Court of Appeals for the Second Circuit on June 20, 2019. (Dkt. No. 37.) On appeal, Plaintiff argued that his failure to exhaust his administrative remedies should be excused "[b]ecause officers intercepted his grievances and therefore prevented them from being timely." (Dkt. No. 39 at 3.[1]) By Summary Order dated March 3, 2021, the United States Court of Appeals for the Second Circuit vacated the judgment and remanded the matter to the District Court to "[e]valuate in the first instance whether Smith's non-conclusory factual allegations raise a genuine issue of material fact as to exhaustion." *Id.* at 4.

This matter was then reopened by the Hon. Mae A. D'Agostino, U.S. District Judge, and twice scheduled for an exhaustion hearing, but the scheduled hearings were adjourned for reasons beyond the control of the Court. (Dkt. Nos. 54, 59.) Thereafter, the matter was referred

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. The Exhaustion Hearing transcript is filed on the docket at Dkt. No. 73 and references to it will be referred to as "T." with the corresponding transcript page number.

to the undersigned, for the purpose of conducting the exhaustion hearing which was held on August 16 and 17, 2021.  (Dkt. No. 60; Text Minute Entries 8/16/2021, 8/17/2021.)

Based upon the evidence adduced at the hearing, the Court concludes that while Plaintiff did not exhaust the administrative remedies set forth in the DOCCS Incarcerated Grievance Program[2] ("IGP"), N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013), he failed to do so because the remedies were rendered unavailable to him due to the opacity of the DOCCS grievance program as administered in this matter and the inability or unwillingness of DOCCS personnel to provide relief.  Therefore, the Court recommends Plaintiff be excused from the exhaustion requirements of the DOCCS IGP.

## II.    HEARING TESTIMONY AND EVIDENCE

At the evidentiary hearing, the Court heard testimony from Rachael Seguin ("Seguin"), who works as the DOCCS Assistant Director of the IGP at the Central Office Review Committee ("CORC"), Peter DePalo ("DePalo"), a lieutenant in the employ of DOCCS at Great Meadow, Alexandria Cutler nee Mead ("Cutler"), current IGP Supervisor at Great Meadow, and Matthew Waters ("Waters"), former IGP Supervisor at Great Meadow, for Defendants.  Plaintiff testified on his own behalf.  Dodge, Ashline, McNally, and Murray, the named Defendants, did not testify at the hearing.

### A.    Exhibits

The parties stipulated to the admission of Exhibits P-1 through P-27 propounded by Plaintiff consisting mainly of Plaintiff's grievances, medical records, and letters.  The parties also stipulated to the admission of Exhibits D-1 through D-9 submitted by Defendants consisting

---

[2]  The Incarcerated Grievance Program was formerly known as the Inmate Grievance Program. (T. at 23.)  This was a title change that did not involve any changes to the process and procedures of the program.  *Id.*

generally of DOCCS Directive 4040: Inmate Grievance Program, CORC list, grievance list, and grievances for Smith. The Court considered all the Exhibits and will address them as necessary in context below.

**B.    Summary of Testimony**

1.    <u>Rachael Seguin</u>

Seguin currently serves as the Assistant Director of the IGP in Albany, a position she has held since June of 2017. (T. at 21.) In this role, Seguin "oversee[s] the grievance operations statewide in all DOCCS correctional facilities to ensure compliance with the department policies and procedures and all applicable rules and regulations." *Id.* at 22. Seguin described the grievance process as set forth in DOCCS Directive 4040 in general and Plaintiff's use of the same. *See id.* at 23-41; Ex. D-1. Regarding the appeals process in general, Seguin testified CORC is the final level of appeal of the grievance program. *Id.* at 24. Per Directive 4040, Seguin stated, "Once CORC renders its decision on the final appeal, then [the grievance] is fully exhausted at that point." *Id.* at 26.

Regarding Plaintiff's use of the inmate grievance appeal system, Seguin testified CORC records indicated no grievance or appeal was filed by Plaintiff regarding the use of excessive force on September 9, 2015. *Id.* at 28-33, 39. Plaintiff did appeal a complaint from October of 2015 regarding commissary issues to CORC. *Id.* at 31; *see also* Ex. D-2. Plaintiff also wrote to CORC on November 1, 2015, indicating he had been submitting grievances, but they were not being acknowledged nor were responses provided from the IGP. *Id*. at 34; *see also* Ex. P-18. While Seguin acknowledged Plaintiff's letter to CORC was received, CORC determined the letter was not considered a grievance per Directive 4040. *Id.*

Seguin also testified that another letter Plaintiff purportedly wrote to CORC dated November 11, 2015, regarding grievances not being filed was never received by CORC. *Id.* at 35-37; *see also* Ex. P-20. Nevertheless, Seguin noted this letter was likewise not considered a grievance under Directive 4040. *Id.* at 37. She also testified neither letter (Ex. P-18 and P-20) could be considered a request for an extension to file a grievance "[b]ecause any request for an extension to file a grievance or file an appeal of a grievance has to be submitted to the [Inmate Grievance Resolution Committee ("IGRC")] at the facility." *Id.* at 38.

Additionally, Seguin testified that where an inmate does not receive a response to his grievance within the appropriate timeframe, the inmate "can request to appeal to CORC as [the response] being untimely." *Id.* at 52. However, if an inmate attempts to file a grievance that is lost or does not arrive at the IGP office, Seguin confirmed there is nothing to appeal at that point. *Id.* Nevertheless, the inmate can submit a late grievance up to 45 days after the date of the event being grieved and "provide mitigated circumstances to the [IGP] supervisor when they submitted the complaint of why it is past the 21 calendar days." *Id.* at 53; *see also id*. at 68. If a request to submit a late grievance is denied and the individual disagrees with that denial, the inmate "then can file a grievance challenging that determination." *Id.* Thus, if a grievance was never received or was denied for untimeliness, the only avenue or redress would be to file a grievance about the fact that the grievance was either never received or was untimely. *Id.* at 52-55.

Plaintiff's grievance dated September 28, 2015, pertaining to the September 9, 2015, assault was stamped as received by the IGRC office on October 22, 2015. *Id.* at 57. Per Directive 4040, grievances regarding staff misconduct should be given a grievance number, a specific classification code ("Code 49"), and then be forwarded to the facility superintendent who has options for further follow up. *Id.* 57-64; Ex. D-1. However, the grievance dated

September 28, 2015, did not have a grievance number, nor a classification code, and the superintendent did not take any of the follow up steps.  *Id.* at 62, 64, 67.  Sequin clarified that untimely filed grievances do not trigger the obligations of the superintendent to follow up, nor do such grievances get a classification code.  *Id.* at 81-84, 87.  She also noted that Plaintiff's grievance dated September 28, 2015, did not request an extension to file a grievance related to the September 9, 2015, incident.  *Id.* at 83.  She acknowledged that the September 28, 2015, grievance did indicate the Plaintiff was in the hospital after the incident and that could be a mitigating circumstance for filing a late grievance, *id.* at 68-69, 88, but reiterated that the grievance was "missing a request" to submit it late.  *Id.* at 88.

      2.    <u>Peter DePalo</u>

DePalo has been employed by DOCCS for over 28 years and was a captain at Great Meadow in 2015.  (T. at 92.)  As part of his duties as a captain, he made at least weekly rounds in the Special Housing Unit ("SHU") during the relevant time from September to December of 2015, to ensure operational functions were correct, security was appropriate, and he would interact with incarcerated individuals if they had questions.  *Id.* at 92-94.  At that time, Plaintiff was housed in the B-1 SHU unit which consisted of 38 cells, with gates and officer stations at either end of the gallery of cells.  *Id.* at 94-95.  Only one officer would be on the unit on the overnight shift; the day shift had five officers; and the afternoon shift had one officer.  *Id.* at 95.  During the afternoon and overnight shift, a supervisory officer would make rounds as needed in the SHU, and the day shift had one supervisory officer for two SHU blocks.  *Id.*  Video cameras located in various areas around the SHU could not be manipulated nor controlled by officers as to whether they were stopped or started.  *Id.* at 96-97.

DePalo testified about the mailing system for SHU, which was one of the ways an incarcerated individual could submit grievances. *Id.* at 97-99. Inmates placed mail which included grievances on the front of their cell bars, and such documents were collected by the corrections officer working the overnight shift on weekdays. *Id.* The officer would place those items in a brown paper bag and take the bag to the correspondence office where the mail was then delivered out to different areas of the facility. *Id.*; *see also id.* at 118. Grievances could also be given to grievance supervisors, who made at least weekly rounds in the SHU, and to the law library officer who made rounds daily on weekdays. *Id.* at 99-100. All officials who pick up the mail and grievances work for DOCCS. *Id.* at 115. Grievance forms were available at the officers' station on the unit and from the law library officer. *Id.* Pen, paper, and other office supplies were available to inmates in the SHU. *Id.* at 101.

Video cameras were in certain parts of the SHU such that officers were visible on camera when they collected mail from incarcerated individuals housed in the SHU; however, DePalo did not know if video from the relevant time still existed since it may have been recorded over. *Id.* at 97-98, 105, 109. Inmates do not get a receipt or any proof that the mail or grievance was picked up from their cells by prison officials. *Id.* at 113-115. DePalo did not know if Defendants Dodge, Ashline, McNally, or Murray had any mail or grievance collection responsibilities in the SHU during the relevant time. *Id.* at 116. Lastly, DePalo testified that Edward Carpenter was a corrections officer who notarized Smith's September 28, 2015, grievance on September 29, 2015. *Id.* at 121; *see also* Ex. P-6.

### 3. Alexandria Cutler

Cutler is the current IGP supervisor at Great Meadow where she is responsible for filing grievances, assigning grievance numbers and codes, investigating and resolving grievances, and

filing appeals. (T. at 127-128.) She was not the IGP supervisor in 2015, nor did she have anything to do with filing or reviewing grievances or correspondence that came into the grievance office at Great Meadow in 2015. *Id.* at 141. Grievances are maintained for the current and previous four years in the grievance office, along with correspondence. *Id.* at 129. Grievances that are rejected as untimely are maintained with correspondence in the grievance office for that same amount of time. *Id.* Written requests for an extension of time to file a grievance are also maintained in the grievance office of the facility for the current year plus four years prior as well. *Id.* at 130.

Smith was housed in Great Meadow from May 19, 2015, through December 24, 2015, in the SHU, except when he went to an outside hospital on September 15, 2015, and returned on September 19, 2015, and when he left for a court trip on October 7, 2015, and returned October 8, 2015. *Id*. at 131-132; Ex. D-3. While housed at Great Meadow in 2015, Plaintiff filed eight grievances between October 8, 2015, and November 25, 2015. *Id*. at 135; Ex. D-5. Plaintiff appealed one of those grievances, a complaint about his commissary sheet, to CORC. *Id*. at 136. The grievance was dated October 1, 2015, and marked as filed at Great Meadow one week later on October 8, 2015. *Id.* at 136; Ex. D-6. The date of the incident that is the subject of the grievance is the date used to calculate the 21-day timeframe to file grievances even though the grievance was received and filed a week after it was dated. *Id.* at 142-143, 147. This grievance did not indicate prior grievances were not being filed. *Id*. at 136. It is possible for grievances to be backdated; however, incarcerated individuals have no control over when the grievance arrives in the grievance office once it has been sent through the facility correspondence or given to a grievance officer. *Id.* at 147, 149.

Cutler did not locate any grievances or letters from Plaintiff about the September 9, 2015, assault. *Id.* at 137-138. She did locate Plaintiff's September 28, 2015, grievance that was received on October 22, 2015, in the grievance office, but it was not on the grievance list. *Id.*; Ex. D-8, P-2. She did not find Plaintiff's grievance dated September 22, 2015, regarding the assault. *Id.* at 138-139; Ex. P-1.

4.    Matthew Waters

Waters has been employed by DOCCS since 2006 and is currently the IGP supervisor at Washington Correctional Facility where he's been since 2016. *Id.* at 150. He previously worked at Great Meadow and was the acting IGP supervisor at that facility from September 2015 through December 2015. *Id.* at 151.

He described the grievance procedures at Great Meadow in accordance with Directive 4040 which includes information for inmates in the SHU, and he testified the procedures are explained to new inmates during their orientation to the facility. *Id.* at 153-56; *see also* Ex. D-1. Individuals housed in SHU submit their grievances through the mail or they can hand it to a grievance officer or staff member during weekly rounds, but it is generally done through the facility mail system. *Id.* at 156-157. He confirmed the 21-day timeframe to file a grievance starts the date of the grieved incident; a grievance is considered filed on the date it is received by the grievance office; and inmates can request a 45-day extension with a valid reason for the extension. *Id.* at 158-159. Waters further explained that a request for extension must be in writing to the attention of the IGP supervisor; it must request the extension; and it must provide a valid reason indicating why the extension is necessary. *Id.* at 160-162; Ex. D-1.

Waters confirmed that mail pickup in the SHU from an inmate's cell door slot is done by correction officers on the overnight shift. *Id.* at 166. It is put in a bag and brought to the

correspondence office where it is sorted and put into departmental mailboxes, including the grievance department mailbox. *Id.* It usually takes one to three days to get sorted from the correspondence room and put into the grievance mailbox which was checked every morning. *Id.* at 167. Grievances could also be handed to the grievance officer on his weekly rounds, and the SHU inmate could also complain to the grievance officers on rounds that grievances were not being filed. *Id.* at 167-168.

Waters then reviewed Plaintiff's grievance dated September 28, 2015, and marked as received by the grievance office on October 22, 2015. *Id.* at 169-171; *see also* Ex. D-8, P-2. Because the subject of the grievance was the assault of September 9, 2015, Waters determined the grievance was late and returned it to Plaintiff with a letter explaining the grievance was untimely. *Id.* at 171-173; *see also* Ex. D-9. Plaintiff could have included a written request for an extension of time to submit the grievance late, but the grievance as written did not include a request for an extension or a reason for it which are required. *Id.* at 173-174, 202-203; Ex. D-8. Although Plaintiff indicated he had been in the hospital, and he requested that the September 9, 2015, assault be fully investigated, Waters determined the document was neither a timely grievance, nor a request for an extension of time to file a grievance. *Id.* at 202-203; Ex. P-2, D-8, D-9. If a grievance is rejected as untimely, the inmate can grieve the untimeliness decision. *Id.* at 192, 197. Waters' letter back to Plaintiff may have taken a few days to get to Plaintiff through the facility mail. *Id.* at 197; *see also* Ex. D-9. Plaintiff wrote again to Waters on October 28, 2015, regarding the timeliness of his grievances, but Waters determined that document was not a grievance in proper form to challenge the previous untimeliness determination. *Id.* at 199-200*;* Ex. P-16.

Waters indicated there was no record of a timely grievance filed at Great Meadow by Plaintiff regarding the September 9, 2015, assault, and none of the letters or grievances Plaintiff claims he sent about that assault were received by the grievance office. *Id.* at 175-180; Ex. P-1, P-6, P-8 through P-11. While in each of the letters Plaintiff references that he is not receiving responses to his Code 49 grievances, the grievances do not mention the assault of September 9, 2015, and they do not request an extension of time to file a grievance. *Id.* If the letters had been timely submitted Code 49 grievances, he would have forwarded them to the Superintendent per Directive 4040 on the day they were received. *Id.* at 195. However, several of the letters were not addressed to the grievance office; they did not specifically address the assault of September 9, 2015; and none of the letters specifically requested an extension to file a grievance for that incident; therefore, they were not considered grievances. *Id.* at 180-185; P-7, P-9, P-12, P-15, P-16.

Waters sent Plaintiff letters telling him to file all grievances with the grievance office. *Id.* at 180, 183; Ex. P-11, P-15. Waters also indicated Plaintiff's letters were not on a grievance complaint form which is required for it to be considered a grievance as opposed to correspondence. *Id.* at 185. However, if a grievance form is not readily available, regular plain paper can be used so long as it is identified as being a grievance and it explains the action requested. *Id.* at 186. Plaintiff also wrote to the superintendent indicating that his grievance regarding the September 9, 2015, assault was not filed, but because the underlying grievance was rejected as untimely, any appeal to the superintendent would be ineffective. *Id.* at 187-189; *see also* Ex. P-19. Plaintiff sent another letter to the grievance office which was again not considered a grievance by Waters who sent a response to Plaintiff. *Id.* at 189-190; Ex. P-21, P-

23.  According to Waters, these correspondences show that Plaintiff was able to use the mail while housed in the SHU.  *Id.* at 190.

       5.    <u>Plaintiff</u>

Plaintiff's testimony recounted his use of the IGP following the September 9, 2015, incident and throughout his time in SHU at Great Meadow.  *See generally id.* at 213-285.  He understood how the grievance process worked.  *Id.* at 213-214.  Following the alleged assault on September 9, 2015, Plaintiff testified he was in the infirmary at the facility on SHU status and in the hospital until September 21, 2015.  *Id.* at 215-220.  He wrote his first grievance regarding the September 9, 2015, assault on September 21, 2015, but dated it September 22, 2015, because that is when it would be picked up after he placed it in the slot on his cell door since mail is picked up by the officer on the overnight shift.  *Id.* at 220-222, 273; Ex. P-1.  He did not know who picked it up, but it was a Caucasian corrections officer.  *Id.* at 222-223.  Plaintiff noted that prison officers in the chain of command, including grievance officers, usually do not stop to talk to inmates in the SHU when doing rounds because they generally require inmates to speak to the corrections officers first.  *Id.* at 224-225.

When he had not heard anything back from the grievance office regarding his September 22, 2015, grievance, Plaintiff placed another grievance written and dated September 28, 2015, about the September 9, 2015, assault on his cell door which was picked up on the overnight shift in the early morning of September 29, 2015, by an unknown corrections officer.  *Id.* at 227-231, 274, 279.  The grievance he submitted was not notarized; however, he had made copies of it using carbon paper, and during the daytime hours of September 29, 2015, he had the copies notarized.  *Id.* at 227-231, 235-237, 279; *compare* Ex. P-2 *with* Ex. P-6.  As for the unnotarized copy of the grievance dated September 28, 2015, which was stamped received by the grievance

office on October 22, 2015, and rejected as untimely, Plaintiff did not know why it took so long

for the grievance to get to the facility grievance office, nor did he have any control over when it

got to the grievance office once he placed it on his cell door.  *Id.* at 233-234.  Plaintiff did not

mention the September 22, 2015, grievance in the September 28, 2015, grievance.  *Id.* at 282-

283; *compare* Ex. P-1 *with* P-2.  Grievances were submitted in sealed envelopes that did not

identify the subject matter of the grievance.  *Id.* at 284-285.

Plaintiff then sent a copy of the grievance notarized on September 29, 2015, to the

grievance office no later than October 28, 2015, when he wrote in follow up about the grievance

being denied as untimely.  *Id.* at 239-241; Ex. P-6.  In an attempt to follow the chain of

command and exhaust his remedies at the facility, Plaintiff also wrote to the supervisor of

programs at Great Meadow, Deputy Melecio ("Melecio"), as well as Superintendent Miller

("Miller") to complain about his grievances regarding the September 9, 2015, assault not being

addressed.  *Id.* at 244-245; Ex. P-1, P-2, P-7, P-9.  Plaintiff received responses from both

Melecio and Miller.  *Id.* at 245-246; Ex. P-8, P-10.  Melecio responded that Waters had already

sent Plaintiff correspondence about his grievances, and Miller responded that Plaintiff's letter

was being referred to Melecio.  *See* Ex. P-8, P-10.  Waters authored a memo to Plaintiff advising

him that the unnotarized grievance was returned as untimely.  (T. at 247; Ex. P-13.)  Plaintiff

then wrote again to Waters complaining that all his grievances regarding the assault, and many

others, were not getting through to the grievance office.  *Id.* at 249-254; Ex. P-16.  In that letter,

Plaintiff acknowledged that he knew how the grievance system at DOCCS worked, and the only

grievance that got through to the office soon after it was written was the grievance about the

commissary.  *Id.* at 249-254, 271; Ex. P-16.

Attempting to fully grieve the assault, Plaintiff also wrote to CORC on November 1, 2015, about his grievances not getting through to the IGP office at Great Meadow. *Id.* at 256-258; Ex. P-18. Plaintiff wrote other letters to Miller and CORC regarding his grievances not being filed. *Id.* at 258-263; Ex. P-19 through P-22.

### C.   Closing Arguments

With the permission of the Court, counsel made closing arguments at the end of the hearing proof. Defendants contend the grievance program was fully functional at Great Meadow during the relevant period of Plaintiff's confinement there and Plaintiff knew how to use it, yet Plaintiff cannot prove he properly submitted or filed any grievances related to the September 9, 2015, incident, and that Plaintiff is not credible. *Id.* at 286-292. Defendants assert Plaintiff's September 22, 2015, grievance, (Ex. P-1), was never received by the grievance office; however, it showed Plaintiff could file a grievance within the requisite 21-day timeframe. *Id.* at 287. The grievance dated September 28, 2015, was the only one received by the grievance office regarding the September 9, 2015, assault, but it was untimely received on October 22, 2015. *Id.* at 287-288. Plaintiff filed other grievances during the same timeframe that were received by the grievance office, all grievances are submitted in sealed envelopes, and no evidence was submitted regarding any motive to discard Plaintiff's grievance mail. *Id.* at 288-289. Defendants also point out that Plaintiff used the intra-facility mail system and the IGP on other occasions without issue. *Id.* at 290-291.

Plaintiff contends he used the proper procedure for submitting his grievances regarding the September 9, 2015, assault, but that he was consistently met with roadblocks and the system was so opaque that he should therefore be excused from the exhaustion requirement. *Id.* at 292-302. Specifically, Plaintiff acknowledges he knew how to use the grievance process, and

grievances for other issues including the commissary problem were received by the grievance office; however, the grievances concerning his more serious assault were either not received or were not received in a timely fashion. *Id.* at 292-293. Plaintiff argues that after he "made noise" to Miller and Melecio about his grievances regarding the assault not being addressed, the September 28, 2015, grievance was located and returned as untimely. *Id.* at 293-294. Plaintiff also notes that no evidence was submitted to determine who was collecting the grievance mail from Plaintiff's cell in the SHU. *Id.* at 295-296. DePalo testified it could have been the officers who assaulted Plaintiff and information could be made available to determine who collected the mail. *Id.* Additionally, Plaintiff had a copy of the September 28, 2015, grievance as notarized on September 29, 2015, which shows it was made at that time, even though he submitted the unnotarized copy to the grievance office on the night before it was notarized. *Id.* at 297.

Plaintiff also argues that his September 28, 2015, grievance fits the requirement for a request for additional time since it was stamped as received by the grievance office within 45 days after the September 9, 2015, incident; it referenced Plaintiff being in the hospital; and it was labeled a grievance with the action requested that the incident be investigated. *Id.* at 297. Waters made the determination that simply because it did not specifically say Plaintiff was requesting additional time, it was not deemed a request to file a late grievance. *Id.* Once Plaintiff received the rejection of that grievance as untimely, Plaintiff filed another grievance to question the untimeliness decision, yet Waters testified he determined it was simply correspondence, not a grievance to address the untimeliness decision, so a response from the grievance office was never sent regarding that submission by Plaintiff. *Id.* at 299-300. Thus, Plaintiff argues the grievance process was not available.

## III.    LEGAL STANDARD FOR EXHAUSTION

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly.  *Id.* at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "'using all steps that the [government] agency holds out, and doing so properly'" (quoting *Woodford*, 548 U.S. at 90)).  In New York State prisons, DOCCS has a well-established three-step IGP.  7 N.Y.C.R.R. § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence.  *Id*. § 701.5(a)(1).  A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the

grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.5(d)(3)(ii).

Grievances alleging employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. *Id.* § 701.8; *see, e.g.*, *Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009) (Section 701.8 has been found applicable to claims of excessive force.). The superintendent is required to initiate an in-house investigation by higher-ranking supervisory personnel; request an investigation by the Inspector General's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. *Id.* § 701.8(d).

A grievance referred to the superintendent and determined to be an allegation of harassment may not be withdrawn and must be addressed by the superintendent. *Id.* The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the

grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g).

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotation marks and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotation marks and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not "available" to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860. In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. Plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*. *Id.*

## IV.    ANALYSIS

Applying the legal standard set forth above, the issue of exhaustion involves a two-step analysis. First, the Court must determine whether Plaintiff properly exhausted his administrative remedies by following all the steps required by the administrative review process. Second, if Plaintiff did not exhaust his administrative remedies, the Court must then determine whether the administrative remedy was available to Plaintiff. Both steps of the analysis are relevant here.

### A.    Plaintiff's Failure to Exhaust

Plaintiff claims he submitted written grievances relating to the September 9, 2015, assault on September 22, 2015, and September 28, 2015, by using his SHU cell gate which was the typical method for mail pick up in the SHU. (T. at 223, 229.) Nevertheless, the undisputed evidence presented in the record and at the exhaustion hearing shows there is no record of any grievance related to the alleged September 9, 2015, assault having been filed at Great Meadow until the September 28, 2015, grievance was allegedly received by the grievance office on October 22, 2015, which was rejected as untimely. *Id.* at 169-171. Despite Plaintiff writing

numerous letters about his Code 49 grievances not being filed, CORC had no record of any appeal related to the September 9, 2015, assault. *Id.* at 28-29. Therefore, the Court finds that Plaintiff failed to exhaust his administrative remedies under the DOCCS IGP prior to commencing this lawsuit. *See Woodford*, 548 U.S. at 93; §§ 701.8(f), (g).

### B.    Availability of Administrative Remedies

As explained above, the Court's finding that Plaintiff failed to exhaust his administrative remedies does not end the exhaustion review. Whether a plaintiff exhausted his administrative remedies is a legal question that requires a defendant to produce reliable evidence of availability. *See Coleman v. Nolan*, No. 9:15-CV-40 (ATB), 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018). "[O]nce a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable." *Id*. (citing *Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013)). As such, "'the burden of production' may shift to a plaintiff when a court considers whether the grievance process was unavailable[.]" *Id*. (citations omitted).

Here, as noted, the Court finds Defendants have satisfied their initial burden of demonstrating remedies were generally available to Plaintiff, and that Plaintiff nevertheless failed to exhaust those remedies prior to commencing this action. The inquiry therefore turns on whether Plaintiff's administrative remedies were unavailable under *Ross*.

*Williams v. Correction Officer Priatno* instructs that administrative remedies are unavailable to a plaintiff where a grievance is "unfiled and unanswered" because "the process to appeal . . . is prohibitively opaque, such that no inmate could actually make use of it." 829 F.3d 118, 126 (2d Cir. 2016). There, the plaintiff alleged that, while housed in the SHU, he drafted a

grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id*. at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id*. at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. *Id*. The plaintiff never appealed the grievance. *Id*. The Court found that "in giving his grievance to the correction officer, Williams exhausted all administrative remedies that were available to him." *Id*. at 126.[3]

Notably, the plaintiff in *Williams* also supported his allegation of unavailability "by providing the court with the date he filed the grievance, the procedure for how he filed it, and the timeline for roughly when [] subsequent follow-up conversations occurred." *Ozzborn v. Cornell*, No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at *4 (N.D.N.Y. June 2, 2021) (citing *Williams*, 829 F.3d at 121). In applying *Williams*, this Court has held that it is sufficient for a plaintiff to "submit [] a sworn statement that he gave his grievance to a correction officer," and the plaintiff is "not then required to produce a greater amount of evidence than normally required of a non-movant at the summary judgment stage." *Hudson v. Kirkey*, No. 9:20-CV-0581 (LEK/DJS), 2021 WL 1966721, at *4 (N.D.N.Y. May 17, 2021) (citing *McLean v. LaClair*, No. 9:19-CV-1227 (LEK/ATB), 2021 WL 671650, at *8 (N.D.N.Y. Feb. 22, 2021)).

Recently, Magistrate Judge Hummel surveyed cases applying *Williams*. *See Tillman v. Phillips*, No. 9:19-CV-1597 (LEK/CFH), 2021 WL 5233308, at *5-6 (N.D.N.Y. Nov. 10, 2021) (collecting cases applying *Williams*), *report and recommendation adopted*, 2021 WL 5768393 (N.D.N.Y. Dec. 6, 2021). Since *Williams*, this Court has denied summary judgment on

---

[3] "That *Williams* was decided on a motion to dismiss and not on a summary judgment motion does not change the analysis." *Medina v. Napoli*, 725 F. App'x 51, 54 (2d Cir. 2018) (summary order) (reversing grant of summary judgment and remanding to the district court to apply *Williams*).

exhaustion grounds "where a plaintiff does not have a copy of the grievance, was not confined in

the SHU, and has not submitted any contemporaneous correspondence inquiring about the status

of his grievance, but submitted a sworn response and testified under oath that he submitted a

handwritten grievance and that he verbally followed up with the grievance office." *Id.* (citing

*Maldonado v. Mandalaywala*, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *17

(N.D.N.Y. Feb. 12, 2020), *report and recommendation adopted*, 2020 WL 1157643 (N.D.N.Y.

Mar. 10, 2020)).  This Court has also denied summary judgment where the plaintiff testified that

he wrote two grievances, handed one to a grievance officer while housed in the general

population, and another to a prison guard while housed in the SHU, but "he made no attempt to

follow up or otherwise appeal to the superintendent." *Britt v. Carberry*, No. 9:17-CV-0234

(MAD/DEP), 2019 WL 3365766, at *10 (N.D.N.Y. Mar. 22, 2019), *report and recommendation*

*adopted*, 2019 WL 2437912 (N.D.N.Y. June 11, 2019).

By contrast, this Court has granted a defendant's motion for summary judgment where

the plaintiff testified during a "deposition that he filed a grievance by leaving a plain envelope

addressed to the grievance committee for the mail personnel to collect," but did not submit

documentary evidence to support the contention and did not verbally follow up with anyone at

the prison about the grievance. *Ozzborn*, 2021 WL 2227829, at *4-5; *see also Sankara v.*

*Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25,

2018) (finding the plaintiff's exhaustion claim insufficient where the plaintiff "provided no

evidence that he actually did write grievances; when they were written; the content of the

grievances . . . the officers named in the grievance(s) . . . ; the specific steps taken by [the

plaintiff] to provide them to an officer to send to the grievance office; and any specific follow up

with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135

(N.D.N.Y. July 13, 2018).

Based upon the evidence and testimony presented at the exhaustion hearing, the Court

finds Plaintiff's failure to exhaust is excusable because the remedies were unavailable to him due

to the opacity of the DOCCS grievance program as administered in this case and the inability or

unwillingness of DOCCS personnel to provide relief.  Indeed, the evidence and testimony

presented at the exhaustion hearing illustrates the opacity of the IGP procedures demanded of

Plaintiff.  The Court also finds Plaintiff's testimony credible regarding his efforts to file

grievances regarding the assault.

For instance, Defendants argue Plaintiff knew how to use the grievance program and he

filed eight grievances while in the SHU at Great Meadow, none of which were about the

September 9, 2015, assault.  (T. at 39, 288-89; Ex. D-5.)  However, all these grievances were

about minor issues such as meal trays, shower mats, and a commissary sheet.  (Ex. D-5.)  It does

not ring true that Plaintiff would file grievances about minor issues such as those, but not file a

grievance regarding an assault which caused injuries requiring hospital treatment.

In addition to the two grievances Plaintiff attempted to file (dated September 22, 2015

and September 28, 2015, respectively) regarding the alleged September 9, 2015, assault, he

wrote several letters to DOCCS personnel at Great Meadow including IGP supervisor Waters,

Programs Supervisor Melecio, and Superintendent Miller, and he wrote to CORC regarding the

Code 49 grievances he submitted that went unanswered.  (T. at 33, 178-179, 185-188, 249-251,

221-232, 257-262; Ex. P-1, 2, 7, 9, 16, 18, 19, 20, 21, 22, 24, 26, 27.)

Additionally, Defendants also argue Plaintiff's letters to CORC about the missing

grievances were not considered proper appeals.  *Id.* at 33-38; Ex. P-18, 20.  According to Waters

and Seguin, an unfiled grievance can never be appealed.  *Id*. at 52-53, 189.  Defendants also

assert that since Plaintiff was able to mail those follow up letters, then the grievance process was

available to him.  *Id.* at 190.  However, according to Seguin, an inmate housed in the SHU who

attempts to file a grievance but then discovers that the grievance was not filed and has become

untimely may file a new grievance about the fact that the grievance was either never received or

was untimely.  *Id.* at 53, 71.  Plaintiff's various letters to Waters, Melecio, and Miller were

clearly Plaintiff's attempts to do just that since he indicated he was not receiving any responses

to his "Code 49" grievances, but because those letters did not specifically state they were

grievances, Waters made the determination that they did not constitute grievances or requests for

an extension of time to file a grievance; rather, he determined the letters were "correspondence"

as opposed to grievances.  *Id*. at 178-79, 184-185, 205; Ex. P-7, 9, 12, 16.

Notably, Defendants did not produce any witnesses who were responsible for picking up

grievances or produce any evidence concerning the identity of the officer(s) responsible for

picking up grievances at the relevant time.  Seguin did not know how grievances were submitted

and logged at Great Meadow in 2015.  *Id.* at 50.  DePalo testified that mail collection in the SHU

occurred on the overnight shift, or a grievance could be submitted directly to the grievance

officer who makes weekly rounds, or to the law library officer who makes rounds on weekdays.

*Id.* at 100.  However, he acknowledged that the staff person who picks up the mail has the sole

and exclusive control over how and when the documents get to the intended recipient, and he had

no knowledge of whether any of the named Defendants had responsibility for collecting mail or

grievances during the relevant time.  *Id.* at 114-116.  DePalo also testified that inmates do not get

any receipt or proof that mail or grievances were picked up from their cells.  *Id.*  Cutler conceded

that an inmate has no control over when a grievance sent by an inmate is actually received by the

grievance office stating: "I'm not part of the correspondence unit." *Id.* at 144.  She also noted Plaintiff's grievance about the commissary issue apparently took one week to arrive at the grievance office. *Id.* at 136.  Waters testified that, although incarcerated individuals can hand grievances to the grievance or law library officers, or supervising officers, "for the most part" they submit a grievance through the facility mail system; such mail then goes to the correspondence unit to get sorted; and the mail can take two to three days, depending on the time of year, to get to the intended recipient. *Id.* at 156-157, 166-167.  However, he testified the date of the incident being grieved is the relevant date to determine whether a grievance is timely or not regardless of how long it may take to reach the grievance office. *Id*. at 177.

Plaintiff confirmed that prison officers in the chain of command including grievance officers usually do not stop to talk to inmates in the SHU when doing rounds and generally require inmates to speak to the corrections officers first. *Id.* at 224-225.  He also testified he sent the September 22, 2015, grievance and the unnotarized copy of the September 28, 2015, grievance to the grievance office through the mail system and they were picked up by the respective overnight officer on duty. *Id.* at 229-230, 273-279; Ex. P-1, 2.  He did not know why the September 28, 2015, grievance was not received in the grievance office until October 22, 2015; he did not know why it took so long to get to the grievance office; and he had no control over when it arrived there. *Id.* at 233-234.  He then had a copy of the September 28, 2015, grievance notarized on September 29, 2015, which shows the document was in existence at that time. *Id.* at 235; Ex. P-6.  The Court finds Plaintiff's testimony credible that he submitted the September 28, 2015, unnotarized grievance by mailing it through the facility mail which was picked up on that overnight shift.  Defendants have not produced any proof regarding who was collecting the mail then and who was responsible for delivering the mail to the correspondence

office.  Nor did Defendants submit any proof from someone in the correspondence office to explain how mail is sorted and distributed throughout the facility or how long it typically takes for the sorting and delivery to occur.

All of this leads the Court to conclude the PLRA textual "unavailability" applies in this case.  First, Plaintiff clearly attempted to grieve the assault incident and he was met with repeated dead ends since Waters and/or other DOCCS employees determined that Plaintiff's many letters, which attempted to appeal his missing grievances, were not themselves grievances because the documents failed to include precise words.  *Ross*, 136 S. Ct. at 1859.  Superintendent Miller referred Plaintiff to Melecio, who in turn referred him to Waters, who in turn determined that Plaintiff's submissions were not proper grievances or appeals.  (T. at 180-185, 187-190, 199-203; Ex. P-7 through P-11, P-15.)  CORC also referred Plaintiff back to the facility.  (Ex. P-25.)  Thus, the Court finds DOCCS personnel were "unable or consistently unwilling to provide any relief" to Plaintiff.  *Ross*, 136 S.Ct. at 1859.

Moreover, just as the plaintiff in *Williams* "technically could have appealed his [unfiled] grievance," the Second Circuit stressed that "the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies" in such a circumstance.  *Williams*, 829 F.3d at 124.  This is because, at the relevant time, "[o]n their face, the regulations only contemplate appeals of grievances that were actually filed."  *Id.*

In other words, Defendants and their witnesses may be correct that Plaintiff could have or should have appealed his unfiled grievances to CORC, requested an extension of time within which to re-file them, or filed new grievances regarding the alleged failure to timely file his earlier grievances, but the process to do so is confusing that, in effect, the Court finds remedies are deemed not available in this situation.  In fact, Plaintiff testified at the exhaustion hearing that

he did attempt to re-file his grievance at Great Meadow by filing the September 28, 2015, grievance, but it inexplicitly took over three weeks to arrive in the grievance office, and it was then rejected as untimely.  (T. at 233-234.)  He then repeatedly sent letters, determined by Waters and others at DOCCS to be merely correspondence and not grievances or appeals, regarding his missing grievances.  (T. at 244-245.)  As noted, the Court finds Plaintiff's testimony credible.  The Court also finds any failure on Plaintiff's part to follow the precise courses of action is nonetheless excused under the Second Circuit's decision in *Williams* because the regulations in effect at the time "give no guidance whatsoever to an inmate" in Plaintiff's position.  Instead, as Defendants' evidence demonstrates, the DOCCS IGP process "is susceptible of multiple reasonable interpretations," when it comes to pursuing a submitted-but-unfiled grievance.  *See Ross*, 136 S. Ct. at 1859.  Additionally, Plaintiff has provided the Court with the dates he filed his grievances, the procedure for how he filed them, and the numerous attempts he employed to follow up on the missing grievances.  All of this supports Plaintiff's allegation of the opacity and unavailability of the grievance process as administered in this instance.  *See Ozzborn*, 2021 WL 2227829, at *4 (citing *Williams*, 829 F.3d at 121).

Considering the foregoing, the Court finds Plaintiff's administrative remedies under the DOCCS IGP were unavailable.  If the District Court adopts this Report-Recommendation, the Court will issue a Mandatory Pretrial Discovery and Scheduling Order.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the District Court determine that the administrative remedies under the DOCCS IGP were rendered unavailable to Plaintiff; and it is hereby

**ORDERED** that the Clerk serve a copy of the Report-Recommendation on the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: January 19, 2022
          Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge